# In the United States Court of Federal Claims

No. 20-1289C
Filed: February 1, 2021
Reissued: February 19, 2021[1]

---

**HUFFMAN BUILDING P, LLC,**

                    *Plaintiff,*

v.

**THE UNITED STATES,**

                    *Defendant,*

**and**

**WINCO ANCHORAGE INVESTORS I, LP,**

                    *Intervenor-Defendant.*

---

*Ryan C. Bradel*, Ward & Berry, LLC, Washington, D.C., and *Rebecca Lipson*, Ashburn & Mason, P.C., Anchorage, AK, for Plaintiff.

*Ann C. Motto*, Trial Attorney, *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, Commercial Litigation Branch, *Jeffrey Bossert Clark*, Acting Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C., *M. Leah Wright*, General Services Administration, Of Counsel, for Defendant.

*Michael Jungreis* and *Keri-Ann Baker*, Reeves Amodio LLC, Anchorage, AK, for Intervenor-Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

  In this post-award bid protest, the incumbent contractor—Huffman Building P, LLC ("Huffman")—challenges the General Services Administration's ("GSA") lease award to Winco Anchorage Investors I, LP ("Winco"). Huffman primarily contests whether GSA should have analyzed the municipal zoning code of Anchorage, Alaska to in determining Winco's building was technically acceptable. In essence, GSA sought a building for the general storage of rocks

---

[1] This Opinion was originally issued under seal. This version incorporates the parties' proposed redactions.

and equipment for the United States Geological Survey ("USGS"). While it used the term "warehouse" to describe the space sought, it did not mandate a particular zoning designation. Huffman focuses on GSA's acceptance of Winco's building which was zoned as a "Research Laboratory," asserting that GSA's and USGS's contemplated use of the building would be unable to comply with Anchorage zoning restrictions under that designation, thus GSA's award was in error.

As explained below, parts of Huffman's challenge go to the administration of the lease contract awarded and thus are not within the ambit of this Court's bid protest jurisdiction. Furthermore, the United States is entitled to judgment on the administrative record with respect to whether GSA's award decision was lawful under the Administrative Procedure Act standard of review. Finally, certain exhibits proffered by Huffman must be stricken because Huffman improperly attempted to supplement the administrative record without seeking leave of the Court. Additionally, the proposed documents are of the same category as those previously excluded by the Court.

Accordingly, the United States' Motion to Dismiss is **GRANTED** with respect to Count I, and its Motion for Judgment on the Administrative Record is **GRANTED** with respect to Counts II & III. Count IV has been voluntarily abandoned and is thus **DISMISSED**. The United States' Motion to Strike is also **GRANTED**.

Because Winco seeks essentially the same relief as the United States, and its motions were filed later, its Motion to Dismiss and Motion for Judgment on the Administrative Record are **DENIED AS MOOT**. Winco's Motion to Strike is **DENIED AS MOOT**, and its request for fees is **DENIED**. Finally, Huffman's Motion for Judgment on the Administrative Record is **DENIED**.

## I.    Background

Huffman was the incumbent for a GSA lease contract for a warehouse-type building in Anchorage, Alaska. (AR1231). That lease expired December 31, 2020 and was not renewable. (AR1141, 1314). In May of 2019, GSA began the procurement process to secure a new long-term lease for warehouse space to be used by the USGS, Alaska Science Center, and Alaska Volcano Observatory located in Anchorage. (AR78, 1141, 1323–28).

In August of 2019, GSA issued a Request for Lease Proposal ("RLP") seeking "a minimum of 14,390 to a maximum of 15,110 square feet of contiguous space on a single floor in a warehouse-type building" with "a minimum clear ceiling height of 18 feet[.]" (AR12). The RLP contained specifications for parking spaces, modernity of the building, loading docks, climate control, and required a unisex bathroom with a shower. (AR12–13). Although the Government specified it would primarily use the space for "general storage," it reserved entitlement "to use the space for any lawful purpose[,]" and disclosed that these activities "may involve the use of hazardous materials." (AR17). Offerors were directed to submit "[e]vidence the Property [was] zoned in compliance with local zoning laws or the Offeror's plan and schedule to obtain all necessary zoning approvals prior to performance[.]" (AR27). Notably, the RFP did not dictate a specific zoning category. Additionally, the offeror-lessor would have a duty to "comply with all Federal, state and local laws applicable to its ownership and leasing of

the Property, including, without limitation, laws applicable to the construction, ownership, alteration or operation of all buildings, structures, and facilities located thereon, and obtain all necessary permits, licenses and similar items at its own expense." (AR99). The RLP stated that "[t]he Lease will be awarded to the responsible Offeror whose *offer* conforms to the requirements of this RLP and the Lease documents and is the *lowest priced technically acceptable* offer submitted." (AR31) (emphasis added); *see also* FAR § 15.101-2. Thus, these two requirements were all that predicated the award.

Huffman and Winco both submitted proposals. (AR642–52, 946–59). Huffman proposed to rent the same building that the USGS was occupying at ███████ annually, a present value of ███ per square foot. (AR647, 1045). Winco proposed to rent its building to USGS at $253,152 annually, a present value of $8.13 per square foot. (AR950, 1095). Winco also submitted several documents that purported to show that its building either had or could obtain the necessary zoning designation for USGS's proposed use and would therefore comply with applicable local law. (AR750 (prior use statement), 774–76 (letter from Anchorage zoning authority), 779–80 (land use records)). The prior use statement from Winco's president certified that the property had "been [used] for office and light warehouse" space since 2003. (AR750, 1140). The letter from the Anchorage Community Development Department, Anchorage's municipal planning and zoning authority, stated:

> The use of the property for a commercial office building in the B-3 (general business) district is a permitted use of the property. The use of the warehouse/storage was established as an accessory use to a permitted retail use at the time of construction in 1984 . . .. Although [we] cannot state the subject property fully conforms to Title 21 requirements, [we] can state that there are no nonconforming issues on file for the subject property.

(AR775, 1138). "Title 21 requirements" refer to Anchorage Municipal Code ("AMC") Title 21, which contains zoning descriptions and specifications. (*See* AR774, 1137). Under Title 21, permissible "Industrial Uses" of buildings zoned B-3 include use as a "Research Laboratory." (AR1469–70); AMC Table 21.05-1: Table of Allowed Uses. Title 21 defines Research Laboratory as:

> A facility that is designed or equipped for basic or applied research or experimental study, testing, or analysis in the natural sciences or engineering, including any educational activities associated with and accessory to such research, and including research and analysis facilities operated by public agencies and designed to assure public health and safety. The use does not include facilities for the manufacture or sale of products except as incidental to the main purpose of the laboratory.

AMC 21.05.060A.7. The third document Winco submitted—the land use records—showed that the building was an "Office Warehouse" with 80,136 square feet of interior "warehouse" space and 19,152 square feet of "multi-use" space. (AR779, 1139).

Huffman and Winco both submitted revised final proposals which changed and narrowed the disparity between the present value rates. The present value rate in Huffman's final proposal

was ▮▮▮▮▮ per square foot. (AR1164). The present value rate in Winco's final proposal was $12.56 per square foot. (*Id.*). Therefore, GSA accepted Winco's offer as the lowest-priced, technically acceptable proposal. (AR1164; 1173). GSA notified Winco and Huffman of the award on May 4, 2020, (AR1173, 1175), and the lease was executed the next day. (AR1356).

Huffman protested that award decision at the Government Accountability Office ("GAO"), claiming that GSA failed to accurately calculate an overall price that included relocation costs and unreasonably determined Winco was capable of securing the required land use approvals. (AR1183; 1185–87). The GAO denied Huffman's protest on both grounds. (AR1307; 1309–11). Significantly, the GAO noted that "whether Winco's proposed property complies with local zoning laws in accordance with the solicitation's requirements is a matter of contract administration[.]" (AR1313).

Just over a month after the GAO denied its protest, Huffman filed this protest. (Compl., ECF No. 1). The Complaint challenged the award on four grounds: (1) GSA changed the use of the premises post-award in a material modification to the solicitation; (2) Winco's offer was not technically acceptable, because the building offered by Winco did not meet the zoning requirements delineated in the solicitation thus USGS's use of the building would not comply with local zoning requirements; (3) in the alternative, in making a responsibility determination, the contracting officer failed to consider whether Winco's offered building could obtain the zoning designation required for performance; and (4) GSA failed to conduct a technical analysis to determine what a comparable price for Huffman's building would have been had Huffman's building only met the less-demanding commercial zoning requirements.

After the United States filed the Administrative Record, Huffman tendered a Motion to Supplement the Record, seeking to admit three categories of documents: documents provided by GSA to Huffman as part of Huffman's bid protest before the GAO, correspondence between GSA, USGS, and/or contractors doing business on behalf of GSA or USGS and their agents, and correspondence between the awardee and GSA and/or USGS, or other tenant agencies, pertaining to the planned use of the leased premises. (*See* Nov. 10, 2020 Order at 2, ECF No. 25).[2] The Court denied Huffman's motion, finding that with respect to the third category, "the documents Huffman seeks to add to the record go to matters of contract administration, not technical requirements" but that in any event, those documents "were not before GSA in selecting a proposal and are not otherwise necessary for the Court to conduct effective judicial review."[3] (*Id.* at 4).

Thereafter, Huffman filed its Motion for Judgment on the Administrative Record. (Pl.'s MJAR, ECF No. 26). Huffman's motion raised arguments as to Counts I–III of its Complaint,

---

[2] The Nov. 10, 2020 Order was filed under seal. A public version was reissued on December 1, 2020. (*See* ECF No. 29).

[3] Huffman withdrew its request to supplement insofar as the second category of documents was concerned and could not sufficiently articulate the relevance of the first category. (Nov. 10, 2020 Order at 2).

but it failed to brief Count IV and did not address the elements necessary to support injunctive relief. The United States and Winco each responded. (Def.'s Mot., ECF No. 27; Winco's Mot., ECF No. 30). The United States sought dismissal of Huffman's claims raising contract administration issues beyond the Court's bid protest jurisdiction. (Def.'s Mot. at 2). The United States further sought judgment on the administrative record with respect to the remainder of Huffman's claims. (*Id.*). In its Response, Winco urged dismissal of Huffman's entire Complaint, vaguely arguing that Huffman's protest generally focused on zoning issues, which are matters for contract administration beyond the Court's bid protest jurisdiction. (Winco's Mot. at 7).

Despite its initial failed attempt to supplement the record with post award documents, Huffman attached several exhibits to its brief in response to the United States' motions. (*See* Huffman's Opp., ECF No. 32). In their reply briefs, the United States and Winco each moved to strike these documents as not within the Administrative Record and falling within a category of documents excluded by this Court's previous Order Denying Huffman's Motion to Supplement. (*See* Def.'s Reply, ECF No. 33; Winco's Reply, ECF No. 34).

During Oral Argument, the Court reminded Huffman's counsel that several of those exhibits were not part of the administrative record, that counsel was clearly aware of the procedures for supplementing the administrative record given Huffman's earlier motion, and that these documents appeared to be "of the same character" as those precluded by the Court's Order Denying Huffman's Motion to Supplement. (Oral Arg. Tr. at 9:1–7; 11:25–12:8, ECF No. 36). The United States reiterated its position that the documents should be stricken, while Winco urged the Court to consider sanctions including a fee award under RCFC Rules 11(c)(3) and 16(f)(1)(c). (*Id.* at 15:19–16:15). These issues are all now ripe for adjudication.

## II.    Discussion

In Count I, Huffman asserts that GSA changed the use of the premises post-award without properly amending the solicitation. (Compl. at 12; Pl.'s MJAR at 7). The United States argues that Count I is a contract administration issue and thus outside the ambit of this Court's bid protest jurisdiction. (Def.'s Mot. at 19; Oral Arg. Tr. at 17:17–18:11). Consequently, it argues Count I must be dismissed under RCFC 12(b)(1). This argument is dependent on whether the cardinal change doctrine applies. If there was no cardinal change, then the challenge can only be viewed as a challenge to contract administration issues, over which the Court cannot exercise its bid protest jurisdiction.

In Count II, Huffman alleges that GSA's determination that Winco's proposal was technically acceptable was arbitrary, capricious, an abuse of discretion, and not in accordance with law. (Compl. at 12–13; Pl.'s MJAR at 13–16). The United States concedes that the Court has jurisdiction over Count II but asserts that it is entitled to judgment because Winco's proposal was technically acceptable on its face. (Def.'s Mot. at 32; Oral Arg. Tr. at 17:17–18:11).

In Count III, Huffman argues in the alternative to Count II, that the contracting officer failed to consider whether Winco's offered building had or could obtain the zoning designation required for performance. (Compl. at 13; Pl.'s MJAR at 16–20). The United States argues that it interprets Count III to raise an issue regarding Winco's zoning approvals, which would be a contract administration issue over which the Court lacks jurisdiction. (Oral Arg. Tr. at 19:3–

19:16). To the extent Huffman's Count III claim raises an issue regarding affirmative determination of responsibility, the United States concedes the Court would have jurisdiction; however the United States would still be entitled to judgment on the administrative record because the contracting officer was not required to independently verify zoning compliance. (Def.'s Mot. at 30; Or. Arg. Tr. at 42:15–42:21).

Huffman has waived Count IV both by failing to brief any argument on the issue, but also by expressly abandoning the claim at oral argument. (Oral Arg. Tr. at 43:3–43:15 (all parties concurred that Count IV was not briefed and thus "the Court can consider it abandoned.")).

> A. *GSA did not modify the solicitation, the cardinal change doctrine does not apply, and thus Count I must be dismissed for lack of jurisdiction.*

Huffman argues that "GSA's acceptance of Winco's proposal constitutes a cardinal change in the RLP[.]" (Pl.'s MJAR at 8). Huffman's argument is essentially that, through the RLP, GSA sought warehouse and storage space, but because the building GSA accepted was zoned for use as a Research Laboratory, rather than a warehouse, GSA must have changed its intended use of the space it had already accepted in a way that constituted a material modification to the RLP. (*See id*. at 8). Huffman attempts to clarify this forced argument by asserting that GSA overlooked the fact that Winco's building was zoned B-3 (Anchorage's general business district), which prohibited "principal" use as a warehouse. (*Id*. at 12). Therefore, by later claiming USGS would use the building as a Research Laboratory, GSA "effected a cardinal change to the Solicitation that allowed for a technically unacceptable property to compete with Huffman's [property]." (*Id*.). This argument vastly overcomplicates the nature of what took place in this procurement in an attempt to shoehorn a question of contract administration into the Court's bid protest jurisdiction. However, the Court must "look to the true nature of the action in determining the existence or not of jurisdiction." *Katz v. Cisneros*, 16 F.3d 1204, 1207 (Fed. Cir. 1994).

In seeking dismissal of Count I, the United States insists that there was no material modification to the solicitation, and Huffman's challenge to GSA's intended use is in fact a contract administration issue over which the Court has no jurisdiction. (Def.'s Mot. at 20). That is, the United States argues that Count I is actually a challenge to whether Winco in fact had or could obtain the necessary zoning approvals such that GSA and the USGS could use the building for the purposes they intended from the beginning: "warehouse storage of core samples and geological minerals (i.e. "rocks"), [with] an office/laboratory area for [USGS] field staff to research, analyze, and categorize core samples and minerals visually with a wet saw and other specialized equipment." (AR1469).

The Competition in Contracting Act ("CICA") mandates that when executive agencies procure property or services, they must "obtain full and open competition through  competitive procedures in accordance with the requirements of this division and the Federal Acquisition Regulation[.]" 41 U.S.C. § 3301(a)(1). "Modifying an existing contract so that it materially departs from the scope of the original procurement violates CICA by preventing potential bidders from participating in or competing for what should be a new procurement." *Ian, Evan & Alexander Corp. v. United States*, 136 Fed. Cl. 390, 414 (2018); *see also Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 277, *modified*, 63 Fed. Cl. 141 (2004) ("It is well established that

the contract awarded must be the one for which the offerors have competed."). Not every change requires a new procurement, "only modifications outside the scope of the original competed contract" are subject to full and open competition under CICA. *AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993). Whether or not a contract modification falls outside the scope of the underlying contract is a question of whether there has been a "cardinal change" to the contract awarded:

> [A] cardinal change is a breach. It occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for. By definition, then a cardinal change is so profound that it is not redressable under the contract, and thus renders the government in breach.

*Allied Materials & Equip. Co. v. United States*, 569 F.2d 562, 563–64 (Ct. Cl. 1978); *see also AT&T Commc'ns*, 1 F.3d at 1205. "[T]he most common factual scenario that implicates the cardinal change doctrine . . . occurs when a disappointed bidder learns of changes in the awardee's contract, and then attempts to invalidate the contract award on the grounds that the changed contract is not that which was competed by the agency." *Golden Mfg. Co. v. United States*, 107 Fed. Cl. 264, 274–75 (2012).

Huffman does not dispute that GSA never amended the solicitation. (Oral Arg. Tr. at 24:8–24:15). Huffman instead argues that "to the extent the Government is now committing to use the premises for the primary purpose of a Research Laboratory, Huffman believes that's a material change to the lease." (*Id.* at 24:12–24:15). However, the RLP merely sought a building with "a minimum of 14,390 to a maximum of 15,110 square feet of contiguous space on a single floor in a warehouse type building" with "a minimum clear ceiling height of 18 feet" for general storage use. (AR12, 17). Huffman concedes that the RLP did not contain a specific zoning designation requirement. (Oral Arg. Tr. at 30:21–30:24 ("Huffman is not arguing before the Court that Winco was obligated to have any specific zoning designation or any specific use classification.")).

It is apparently understood by all parties that Winco could have sought any zoning designation it desired for its proffered building, so long as that designation would lawfully accommodate GSA's use of the building. Considering this apparent understanding and the nonspecific nature of the RLP's building requirements, Huffman's concession that there was no amendment to the solicitation is fatal to its assertion of a material alteration. Huffman's argument has no basis in the express terms of the RLP. Section 1.15 specified the United States could use the building "for any lawful purpose[,]" but that it would "initially use the space for general storage." (AR17). Whatever that use might entail, it was the offerors' burden to show that use was lawful under the local zoning. (AR99). Section 3.06(c) of the RLP only required *evidence* of proper zoning. (AR27). It did not require a particular zoning designation, or even prohibit a successful offeror from changing the zoning designation it sought after the award.

Winco's efforts to ensure zoning compliance do not evince a "cardinal change" to the solicitation, but rather raise a contract administration issue: whether Winco could provide a building that would lawfully permit GSA's "general storage" uses. Nothing about Winco's efforts can be properly characterized as disguising the nature of the underlying contract or as

frustrating open competition. *See Golden Mfg. Co.*, 107 Fed. Cl. at 275. Winco's choice to accommodate GSA's general storage uses by seeking approval for its building as a Research Laboratory does not equate to "an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for." *Allied Materials & Equip.*, 569 F.2d at 563–64. Therefore, the Court finds there was no "material[] depart[ure] from the scope of the original procurement[,]" and thus the cardinal change doctrine is inapplicable. *See Ian, Evan & Alexander*, 136 Fed. Cl. at 414.

Whether Winco ultimately delivers a compliant building is a question of performance—a contract administration issue between Winco and GSA. *See Furniture by Thurston v. United States*, 103 Fed. Cl. 505, 518–19 (2012) (noting as here, "if the agency accepts a proposal based on a misleading representation, the dispute is solely between the agency and the awardee" as a matter of contract administration). This Court has consistently held that "matters of contract administration—including matters of contract performance—fall beyond the Court's bid protest jurisdiction." *Relyant Glob., LLC v. United States*, 146 Fed. Cl. 817, 823 (2020), *appeal docketed*, No. 20-1526 (Fed. Cir. Mar. 3, 2020); *see also Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995) ("When the Contract Disputes Act applies, it provides the exclusive mechanism for dispute resolution[.]"); *TigerSwan, Inc. v. United* States, 110 Fed. Cl. 336, 348 (Fed. Cl. 2013) (holding that the contractor's complaints with the agency's termination decision are subject to the CDA, not the Court's bid protest jurisdiction).

Under the Court's bid protest jurisdiction, 28 U.S.C. § 1491(b)(1), the Court has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." Deficiencies in meeting the contract requirements post-award do not "constitute a significant, prejudicial error in the procurement process." *Chapman Law Firm v. United States*, 63 Fed. Cl. 519, 529 (2005), *aff'd sub nom. Chapman Law Firm Co. v. United States*, 163 F. App'x 889 (Fed. Cir. 2006) (internal quotations and citations omitted). "Where an offeror has certified that it meets the technical requirements of a proposal, the Contracting Officer is entitled to rely on such certification in determining whether to accept a bid, and the offeror's potential failure to comply with the proposal requirements is ordinarily 'a matter of contract administration,' which does not go to the propriety of accepting the bid." *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1330 (Fed. Cir. 2011) (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1039 (Fed. Cir. 2009)). "'However, where a proposal, *on its face,* should lead an agency to the conclusion that an offeror could not and would not comply with the [applicable requirement], we have considered this to be a matter of the proposal's technical acceptability,' which *does* affect the propriety of accepting the offer." *Allied Tech. Grp., Inc.*, 649 F.3d at 1330 (emphasis in original) (quoting *Centech Grp., Inc.*, 554 F.3d at 1039).

As discussed in greater detail below, Winco's offer facially complied with the RLP requirements. Winco provided evidence that GSA's use of its building would comply with Anchorage zoning ordinances, thus GSA's use would be lawful. Nothing more was required for GSA to find the offer technically acceptable. Should USGS's stated use of the building, "general storage," ultimately fall out of compliance with the permissible uses as defined in Anchorage zoning ordinances, that would be a question of performance, default, and breach—contract

administration issues. Those issues are not before the Court, and the Court lacks jurisdiction to evaluate them under its bid protest jurisdiction invoked by Huffman as the basis for this challenge. (Compl. at ¶ 3). Therefore, pursuant to RCFC Rules 12(b)(1) and 12(h)(3), the Court dismisses Count I for lack of subject matter jurisdiction.

> B.  *Winco's offer was technically acceptable, therefore the United States is entitled to Judgment on Count II.*

In a bid protest, "[t]he court's task is to determine whether (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013) (internal quotations omitted). In Count II, Huffman challenges GSA's decision with respect to the first prong: whether the contracting officer's award decision lacked a "rational basis" and was therefore arbitrary and capricious. (Compl. at 12); *see also Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 384 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

Huffman argues that GSA's decision to award a lease contract to Winco lacked a rational basis because the proposal Winco submitted was not technically acceptable on its face. (Pl.'s MJAR at 6–14). Huffman argues that Winco's offer was not technically acceptable because the building offered was zoned B-3 (general business district)—a zone which purportedly does not permit warehouse use as the "principal" use—and Winco did not present GSA with a conditional use permit necessary to permit USGS to use a B-3 zoned building primarily as a warehouse. (*Id.*; Oral Arg. Tr. at 31:1–31:8). Huffman argues that without the conditional use permit, GSA was required to reject Winco's offer because the 2016 municipal letter (AR1137–38) "should have informed the contracting officer that there was an issue" with using Winco's building for general storage. (Oral Arg. Tr. at 31:9–31:18; 34:20–34:23). Huffman encourages the Court to take a deep dive into the nuances of Anchorage zoning laws. (*Id.* at 31:19–32:12). The Court declines to do so because Huffman's argument is flawed.

The United States correctly points out that the procuring agency is required to rely on the offeror's representations about its ability to perform as included in its proposal unless the proposal contains information that calls those representations into serious doubt. (Def.'s Reply at 18 (citing *Centech Grp., Inc.*, 554 F.3d at 1039) ("[W]here a proposal, on its face, should lead an agency to the conclusion that an offeror could not and would not comply with the subcontracting limitation, we have considered this to be a matter of the proposal's technical acceptability.")).

"The arbitrary and capricious standard applicable [in bid protests] is highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks and citation omitted).

As stated previously, "[w]here an offeror has certified that it meets the technical requirements of a proposal, the Contracting Officer is entitled to rely on such certification in determining whether to accept a bid, and the offeror's potential failure to comply with the proposal requirements is ordinarily 'a matter of contract administration,' which does not go to the propriety of accepting the bid." *Allied Tech. Grp.*, 649 F.3d at 1330 (internal citations

omitted). Furthermore, when a bidder certifies technical compliance with the terms of the solicitation, the agency may accept the bid as technically compliant on its face "where there is no significant countervailing evidence reasonably known to the agency evaluators that should create doubt whether the offeror will or can comply with the requirement." *Id*. at 1331.

Winco supported its offer with three key documents related to its certification of technical compliance with the RLP. First, Winco submitted a letter from the Anchorage Community Development Department, Anchorage's municipal planning and zoning authority, stating:

> The use of the property for a commercial office building in the B-3 (general business) district is a permitted use of the property. The use of the warehouse/storage was established as an accessory use to a permitted retail use at the time of construction in 1984 . . .. Although [we] cannot state the subject property fully conforms to Title 21 requirements, [we] can state that there are no nonconforming issues on file for the subject property.

(AR775, 1138). Second, Winco submitted a public land use document that broadly detailed the specifications of the offered building. (AR779, 1139). That document showed that the building was an "Office Warehouse" with 80,136 square feet of interior "warehouse" space and 19,152 square feet of "multi-use" space. (*Id*.). Third and finally, Winco submitted a letter from its President, Richard Shapiro, stating that since Winco's purchase in 2003, the building had been utilized "for office and light warehouse use[.]" (AR750, 1140). These documents provided the contracting officer with a reasonable  indication Winco could comply with the terms of the solicitation, which required only a building for use as "general storage" that was evidently "zoned in compliance with local zoning laws[.]" (AR17, 27, 99). Besides those requirements, the RLP stated that "[t]he Lease will be awarded to the responsible Offeror whose offer conforms to the requirements of this RLP and the Lease documents and is the lowest priced technically acceptable offer submitted." (AR31); *see also* FAR § 15.101-2. Winco submitted an offer conforming to the RLP which was the lowest-priced. Nothing more was required.

Huffman concedes that GSA is entitled to look at the totality of the circumstances in making its decision. (Oral Arg. Tr. at 36:1–37:3). It also concedes that GSA was permitted to rely on the documents Winco submitted with its offer. (*Id*.). As stated above, contracting officers are afforded the discretion to make procurement decisions that are rational, and not arbitrary and capricious. *Banknote Corp. of Am.*, 56 Fed. Cl. at 384 (2003), *aff'd*, 365 F.3d 1345 ("[N]aked claims, no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious."). Ultimately, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In summary, the Court finds that GSA was entitled to rely on Winco's certification of technical compliance because the totality of the circumstances indicated Winco's proposal was compliant, and there was no significant countervailing evidence to create doubt about whether Winco could comply with the requirements of the RLP. GSA's decision was rational and based on a plethora of supporting documents upon which the contracting officer was entitled to rely, as

Huffman concedes. Therefore, the United States is entitled to judgment on the administrative record with respect to Count II of Huffman's Complaint.

      *C.   Responsibility for zoning compliance resided with the offerors; thus, the United States is entitled to Judgment with respect to Count III.*

As stated in the previous section, in reviewing a bid protest, "[t]he court's task is to determine whether (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Glenn Def. Marine*, 720 F.3d at 907 (internal quotations omitted). In the alternative to Count II, Huffman argues in Count III that the contracting officer deviated from procurement regulations and procedures in failing to consider whether Winco's offered building could obtain the zoning designation required for performance. (Compl. at 13–14). Specifically, Huffman argues that "[t]he contracting officer was required to make an affirmative determination of responsibility that the Winco building met or could achieve the required zoning by the time of performance[,]" but erroneously did not do so. (Pl.'s MJAR at 17 (citing FAR 9.103(b)).

The United States argues that nothing in either the Federal Acquisition Regulations ("FAR") or the RLP required such a determination. (Def.'s Mot. at 29). The United States is correct. When awarding a government contract, the contracting officer must determine that the bidder is "responsible" which, in general, "focuses on the bidder's ability to satisfy its contractual commitments encompassed within its responsive bid." *Ryan Co. v. United States*, 43 Fed. Cl. 646, 651 (1999). FAR 9.103(b) states that "[n]o purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility." The General Services Administration Acquisition Regulations Part 570.108 states that for lease awards, the contracting officer must "[d]etermine that the prospective awardee is responsible with respect to the lease under consideration" using the standards delineated in FAR 9.104. 48 CFR § 570.108.

To be declared "responsible" under FAR 9.104, the prospective contractor must have adequate financial resources to perform the contract, be able to comply with the proposed performance schedule, demonstrate satisfactory performance and ethics records, have "the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them[,]" possess the necessary production, construction, and technical equipment and facilities, or the ability to obtain them[,]" and "[b]e otherwise qualified and eligible to receive an award under applicable laws and regulations[.]" 48 C.F.R. § 9.104-1.

FAR 9.104 does not impose particular zoning requirements. Nor did the solicitation. (*See* AR27 (directing offerors to submit "[e]vidence the Property [was] zoned in compliance with local zoning laws[.]")). GSA's leasing documents explicitly place the obligation of zoning compliance with the offeror, and with good reason. As the GAO explained to Huffman in its decision denying Huffman's protest:

> GSA's Northwest Arctic Region currently handles approximately 15,172,396 rentable square feet spread among 434 locations throughout 4 states. It manages this huge task with a total of 9 contracting officers, some of which also perform supervisory duties in addition to their workload. The standard of review which Huffman insists a GSA contracting officer apply to zoning

requirements is overly stringent. It would require contracting officers to become experts in local law. Zoning codes and ordinances are issued by town and city councils. Even if a contracting officer becomes familiar with leasing laws in each of the four states in which the GSA region operates, they could not possibly know the intricacies of zoning laws in every town in which GSA leases or may in the future lease property.

> *GSA's leasing documents are designed to place the responsibility for compliance with local laws and permit requirements squarely on the shoulders of the lessor.*

(AR1268) (emphasis added). The Court agrees with the GAO that the leasing documents in this case clearly place the burden on offerors to actually achieve zoning compliance, while merely requiring that each offer contain evidence of such compliance or that compliance could be achieved. Thus, the contracting officer did not depart from regulation or procedure when he did not undertake analysis of Anchorage zoning law as part of a responsibility determination, and the procurement was lawful.

In summary, GSA's contracting officer was not required to make an affirmative determination of responsibility as to whether each offeror's building complied with Anchorage zoning ordinances, as the RLP clearly placed the onus on the offerors to achieve zoning compliance. Consequently, the United States is entitled to judgment on the administrative record with respect to Count III of Huffman's Complaint.

> ### D. The Court strikes Huffman's Reply Exhibits A, B, C, and D because they were not preceded by a motion to supplement.

In filing its Reply in Support of its Motion for Judgment on the Administrative Record, Huffman attached five exhibits to its brief. (*See* ECF Nos. 34-1, -2, -3, -4, & -5). These exhibits are not part of the administrative record and, except for Exhibits D & E, are similar in nature to those documents that the Court previously denied admission in its Order denying Huffman's Motion to Supplement the Administrative Record. (Nov. 10, 2020 Order, ECF No. 25). Both the United States and Winco moved to strike these documents. (Def.'s Reply at 3; Winco's Reply at 3).

As is the case in this bid protest, where the parties have filed cross-motions for judgment on the administrative record, RCFC 52.1 provides a procedure for parties to seek the equivalent of an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). Questions of fact are resolved by reference to the administrative record. *Id.* at 1356. Under this standard, the court's review of an agency's decision "does not require a reweighing of the evidence, but a determination whether the conclusion being reviewed is supported by substantial evidence." *Heisig v. United States*, 719 F.2d 1153, 1157 (Fed. Cir. 1983). "The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to convert the 'arbitrary and capricious' standard into effectively de novo review." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (internal citations and quotations omitted).

Exhibit A is a letter from the Municipality of Anchorage to representatives of Winco and its retained consulting group. Exhibit B is correspondence between Winco and a third-party consultant. Exhibit C is correspondence between Winco's attorney and the Anchorage zoning authority that responds to a letter Huffman sent to Anchorage seeking to interfere in the municipality's zoning determination for Winco's building. Exhibit D is an affidavit from a representative of Huffman. All these documents postdate GSA's award of the lease contract to Winco, and therefore, were not before GSA when it made its award decision. Finally, Exhibit E is a publicly available law treatise generally covering municipal land use planning which Huffman provided for the Court's convenience.

The documents marked Exhibits A, B, C, and D are precisely the sort of extra-record evidence the Court is prohibited from considering in rendering a judgment on the administrative record under RCFC 52.1. Moreover, in its previous Order on Huffman's Motion to Supplement the Administrative Record, the Court denied the addition of very similar "post-award documents to the administrative record." (Nov. 10, 2020 Order at 4). The Court also made clear in that Order that "Huffman proposes to add [documents that] were not before GSA in selecting a proposal and are not otherwise necessary for the Court to conduct effective judicial review. Therefore, Huffman's Motion to Supplement with respect to [that] category of documents is . . . **DENIED**." (*Id.* (emphasis in original)). The Court declines to revisit the conclusions reached in its November 10, 2020 Order, and stands on its previous admonishments to Huffman.

Because these are post-award documents that were not considered by GSA in making its decision, they are not part of the administrative record and thus not properly before the Court. *See Axiom Res. Mgmt.*, 564 F.3d 1380. Therefore, the Clerk is **ORDERED** to **STRIKE** Exhibits A, B, C, and D which are attached to Huffman's Reply, (ECF No 34).

### III.    Conclusion

Count I raises what is ostensibly a contract administration claim and must be dismissed for lack of subject matter jurisdiction. Winco's offer was technically acceptable, therefore the United States is entitled to judgment on the administrative record with respect to Count II. Alternatively, Count III asserts a challenge to the contracting officer's responsibility determination but fails because the contracting officer was not required to analyze zoning issues, thus the United States is entitled to judgment on that claim. Finally, Huffman has explicitly waived Count IV, and it is therefore dismissed.

Accordingly, the Court **ORDERS** the following:

(1) The United States' Motion to Dismiss is **GRANTED** with respect to Count I.

(2) The United States' Motion for Judgment on the Administrative Record is **GRANTED** with respect to Counts II & III.

(3) Count IV was voluntarily abandoned and is **DISMISSED**.

(4) The United States' Motion to Strike is **GRANTED-IN-PART**. The Clerk is **ORDERED** to **STRIKE** Exhibits A, B, C, and D which are attached to Huffman's Reply, (ECF No 34).

(5) Winco's Motion to Dismiss and Motion for Judgment on the Administrative Record are **DENIED AS MOOT**.

(6) Winco's Motion to Strike is **DENIED**, and its request for fees is **DENIED**.

(7) Huffman's Motion for Judgment on the Administrative Record is **DENIED**.

(8) **On or before February 16, 2021**, the parties shall file notice of their proposed redactions to this Opinion.

The Clerk is directed to enter judgment consistent with this Opinion. The parties shall bear their own costs.

**IT IS SO ORDERED.**



s/     David A. Tapp
DAVID A. TAPP, Judge